UNITED STATES of America,
Plaintiff,

v.

SABINE TOWING AND TRANSPORTATION COMPANY, Inc. and the TUG AJAX and the BARGE STCO 102, their engines, tackle, apparel, furniture, etc., Defendant.

Civ. A. No. 67–384.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 31, 1968.

Terrence R. Murphy, Attorney, Admiralty & Shipping Section United States Dept of Justice, for plaintiff.

Edwin K. Legnon, George W. Healy, III, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Sabine Towing & Transportation Co., Inc.

CASSIBRY, District Judge:

At 8:20 P.M. on August 13, 1959, a three barge flotilla, some 600 feet long, loaded with gasoline and under the control of defendant Sabine's Tug AJAX collided with and heavily damaged the southwest fender and approach system of plaintiff's Paris Road Bridge while proceeding eastward in the Gulf Intracoastal Waterway.

Negotiations looking toward settlement took place between plaintiff's Army Corps of Engineers and defendant Sabine during the 1959–1963 period but the matter was not referred to the Department of Justice for litigation until January 11, 1967. After demand, the United States filed suit on or about March 18, 1967, seeking $23,033.77 in damages. On June 1, 1967 defendant moved to dismiss the complaint on the ground of laches. The Court denied the motion, without opinion, on July 6, 1967.

The cause came on for trial on April 22, 1968, at which time defendant resubmitted its laches motion. After argument the Court directed that the issue be covered in post-trial briefing. Defendant also offered in evidence an affidavit of its Insurance and Claims Manager

purporting to show prejudice to defendant as a result of the Government's delay in bringing suit. Government counsel objected to its admission on the ground that evidence of prejudice is irrelevant since laches may not be pleaded against the United States. The objection was overruled and the affidavit was admitted into evidence.

When the trial proceeded to the merits, the Government rested its case in chief after stipulating with the defense that at all pertinent times the United States owned and operated the Paris Road Bridge; that defendant Sabine owned and operated the AJAX and her flotilla; and that the lead barge of the AJAX flotilla struck the bridge. Those facts had also been established by the pleadings.

When the Government rested, defendant moved immediately for "judgment on the pleadings," contending that the Government was not entitled to rest on the claimed "presumption", and had made no showing of negligence. The plaintiff insisted that the very fact of collision between a moving vessel and a stationary structure such as a bridge established a *prima facie* case of negligence against the vessel and its owners and operators and required the defendant to come forward with evidence to exonerate itself. The Court took defendant's motion under advisement, and the trial proceeded, with the defense calling witnesses in exoneration, and the Government calling one rebuttal witness after the defense rested.

■ The question of whether plaintiff is entitled to the presumption so as to make out a *prima facie* case of negligence will be discussed first. The plaintiff's position is not entirely free of doubt, since there appears to be a conflict in the Fifth and Third Circuits on the point. Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (5 Cir. 1967); Southern Pacific Co. v. Commercial Transport Corp., 249 F.Supp. 377 (E.D.La.1966); Southern Pacific Company v. United States, 250 F.Supp. 912 (E.D.La.1966); United

States v. Martin (The SS Ballatrix), 114 F.2d 1004 (3 Cir. 1940); Pennsylvania Railroad Co. v. The S. S. Marie Leonhardt, 320 F.2d 262, 265 (3 Cir. 1963). Defendant argues that the Fifth Circuit and Louisiana District cases are distinguishable from the Third Circuit because *Brown & Root* involved a collision with a fixed offshore structure, and the two *Southern Pacific* cases, in which drawbridges were involved, were maintained in an "open" position, and were in that position at the time of the collision, while in the instant case the bridge was not open and, since it was capable of being opened, it was not a stationary object as contemplated by the presumptive rule. This argument is persuasive. The probability that negligence of a ship is the cause of a collision with a drawbridge, which has to be raised to accommodate water traffic, does not appear to me to be any greater than the probability that the drawbridge's negligence caused the collision. Even assuming, however, that the plaintiff is entitled to the presumption here, it cannot prevail under the circumstances of this case.

## LACHES

Assuming that the plaintiff made out a *prima facie* case of negligence, I turn now to a consideration of the defense of laches. The parties were instructed at the trial to offer any evidence they saw fit to support their respective positions on the question of whether the case was time barred or not.

At the outset, the plaintiff admitted that there had been inexcusable delay in filing the suit. Further, under the Louisiana statute of reference, (one year), plaintiff's case has long since prescribed. Since there was inexcusable delay in filing the suit, and as hereinafter shown defendant was prejudiced by the delay, this suit would be subject to immediate dismissal if the plaintiff were anyone but the United States.

■ It appears to be well settled that laches may not be pleaded to defeat an action brought by the United

States. United States v. Kirkpatrick, 9 Wheat, 720, 22 U.S. 720, 6 L.Ed. 199 (1824); United States v. Thompson, 98 U.S. 486, 25 L.Ed. 194 (1878); Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917); United States v. Nashville, C. & S. L. Ry., 118 U.S. 120, 6 S.Ct. 1006, 30 L.Ed. 81 (1886); United States v. 93 Court Corporation, 350 F.2d 386 (2 Cir.1965). The rule is based upon the policy that public interests should not be defeated by the negligence of public officers. The sovereign is not bound by its legislative restrictions upon the exercise of remedial rights unless the legislative intent is expressly and clearly stated.

Probably because inequities such as exist in the instant case shocked its conscience, Congress has passed legislation putting the United States on the same footing as a private litigant when it brings suit in tort or contract, Public Law 89–505, 28 U.S.C. § 2415, July 18, 1966. Defendant contends that this demonstrated a change in Congressional intent, and that the United States should be subject to laches in the instant case. This argument is without merit since Congress saw fit to limit the statute's coverage as follows:

"(g) Any right of action subject to the provisions of this section which accrued prior to the date of the enactment of this Act shall, for purposes of this section, be deemed to have accrued on the date of enactment of this Act."

The instant suit was brought eight months after the date of enactment and it is not, therefore, time barred by the statute.

Defendant contends in an alternative argument that in operating the Paris Road Bridge, the United States was not acting in its sovereign capacity and should, therefore, be treated as a private litigant. In The Llama, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519, cited by defendant, the United States had issued policies of insurance which stipulated that in case of disagreement it might

be sued. The Court held that under the circumstances the Government had "accepted the ordinary incidents of suits in such business." In Rosenberg Bros. & Co. v. United States Shipping Board, etc., 295 F. 372, 379 (D.Cal.1923), the Board unsuccessfully challenged the Court's jurisdiction. It was unable to claim sovereign immunity because it was not the sovereign. The Court held that a Government corporation organized for war purposes was engaged in time of peace in a strictly "private business." This is not true in the instant case. The New Windsor, 1925 A.M.C. 958 (D.C. Fla.1925), does support defendant's position but must yield to higher authority to the contrary. Nabors v. N.L.R.B., 323 F.2d 686 (5 Cir.1963); United States v. Summerlin, 1940, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283.

The United States v. Maryland Casualty Co., 235 F.2d 50 (5 Cir.1956), case is a little more troublesome. There the Fifth Circuit denied the Government's petition to intervene against funds in the registry of the court. Judge Brown wrote that when the sovereign seeks to intervene in a suit on equitable grounds it ought to be treated as any other suitor. The Court said:

"It could be opened only by the touch of the want of equity and not by the sheer weight or the loud preemptory knock of the sovereign's sceptor. Laches which would ordinarily be ineffectual in denying a claim by the Government, United States v. Summerlin, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283. * * * *would therefore visit the same consequences upon the sovereign as it would a citizen where the request to open the portal is through the appeal and power of equity.*" (Emphasis added)

Since the Government's suit in the instant case is one sounding in law, *Maryland Casualty Company* is inapposite.

While there does not seem to be a case squarely holding that the operation of a bridge over a navigable stream is a governmental function, there seems to be little doubt that it is. Kansas City

Bridge Co. v. Alabama State Bridge Corp., 59 F.2d 48 (5 Cir.1932); Dodge County Commissioner v. Chandler, 96 U.S. 205, 24 L.Ed. 625 (1877).

▇ The Paris Road Bridge spans the intracoastal waterway and is adjacent to the Alexander Seaway, a deep sea waterway from New Orleans to the Gulf of Mexico, both of which waterways were built and are now being maintained by the United States. It would be highly unlikely that this bridge would be operated and maintained by anyone other than a sovereign, either state or federal.

I conclude, therefore, that the defense of laches is not available to the defendant.

### THE MERITS

The Gulf Intracoastal Waterway runs generally east and west and is almost straight for several miles east and west of the Paris Road pontoon bridge. Due to its close proximity to the open sea, its waters are subject to the ebb and flow of tides which, in clear weather, rise and fall from a few inches to two feet. Tide velocity on August 13, 1959, at about 8:00 P.M., was approximately four miles per hour running eastward. Although it was after dark, visibility was clear. The Paris Road Bridge was a pontoon swing type bridge swinging westward to open.

Approximately 5.7 miles west of the Paris Road Bridge was the Florida Avenue Bridge. As was customary, the operator of the Florida Avenue Bridge notified the Paris Road Bridge by telephone when the AJAX and tow passed through the Florida Bridge. This put the Paris Bridge operator on notice to be on the lookout for the AJAX in a matter of minutes, depending upon the speed of the tug and tow. Since the intracoastal waterway between the bridges is long and straight and clear of obstructions, by casual observation the AJAX could have been seen for several miles.

All the evidence was to the effect that the Paris Road Bridge was old and ill-equipped and was oftentimes slow in opening. Cecil Jacobs, the master of the AJAX, admitted that on several occasions previously the bridge had been slow in responding to his signal to pass through. Batiste, the bridge maintenance man, also admitted that it was not unusual to experience difficulty with the bridge's gasoline operated engine.

There is some dispute concerning the regulations governing the Paris Road Bridge and the Intracoastal Waterway in this area. Plaintiff contends that the relevant regulation is 33 C.F.R. 207.180, but this cannot be since the Intracoastal Waterway from Apalachee Bay, Florida, to Brownsville, Texas is clearly excluded from coverage:

"(a) The regulations in this section shall apply to:

"(1) *Waterways.* All navigable waters of the United States which are tributary to or connected by other waterways with the Gulf of Mexico, except the Mississippi River, its tributaries and outlets, between St. Marks, Fla. and the Rio Grande, Texas, both inclusive, and the Intracoastal Waterway from Apalachee Bay, Fla. to Brownsville, Texas."

It appears that the applicable statutes and regulations are as follows:

33 U.S.C.A. § 494:

"No bridge erected or maintained under the provisions of sections 491–498 of this title, shall at any time unreasonably obstruct the free navigation of the waters over which it is constructed * * * If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft * * * *"

\* \* \* \* \* \*

33 U.S.C.A. § 499:

"It shall be the duty of all persons owning, operating, and tending the drawbridges built prior to August 18, 1894, or which may thereafter be built across the navigable rivers and other waters of the United States, to open, or cause to be opened, the draws of such

bridges under such rules and regulations as in the opinion of the Secretary of the Army the public interests require to govern the opening of drawbridges for the passage of vessels and other water crafts, and such rules and regulations, when so made and published, shall have the force of law."

Pursuant to 33 U.S.C.A. § 499, the following regulations have been promulgated, which applied to the Paris Road Bridge in August of 1959:

33 C.F.R. § 203.240 provides in pertinent part:

"(a) Corporations or persons owning or controlling a drawbridge shall provide the same with the necessary tenders and the proper mechanical appliances for the safe, prompt, and efficient opening of the draw for the passage of vessels.

"(b) If the weather conditions are good and sound signals can be heard when a vessel approaches a drawbridge and desires to pass through the draw, three distinct blasts of a whistle or horn shall be sounded or three calls through a megaphone shall be made from the vessel when within reasonable hearing distance of the bridge.

"When the draw of the bridge can be opened immediately, the draw tender shall reply with three distinct blasts of a whistle or horn, by three calls through a megaphone, or by three loud and distinct strokes of a bell.

"When the draw of the bridge cannot be opened immediately, or when the bridge is open and is to be closed immediately, the draw tender shall reply by four or more short, distinct blasts of a whistle or horn, by four or more calls through a megaphone, or by four or more loud and distinct strokes of a bell (danger signal)."

Since I am allowing a rebuttable presumption that the defendant was negligent, defendant had the burden of proving itself free of negligence which proximately contributed to the accident. Although this became a rather heavy burden because of the lapse of time between the accident and the trial of the case, I find that defendant met its burden. In eight and one-half years memories were dimmed, deaths occurred and loyalties changed which not only burdened the litigants but seriously handicapped this Court in ferreting out the truth. Five out of eight of defendant's crewmembers are no longer available. Only the Captain and one deckhand was left who witnessed the accident.[1] The bridge tender at the time of the accident died several years ago. The bridge tender's assistant, Haywood J. Batiste, was discharged shortly after the accident for misconduct and at trial time had become hostile to the Government (although not necessarily untruthful). He repudiated a statement he gave in 1959, explaining that at the time he was merely protecting his job and covering up for a blundering bridge tender who, he says, was sick and unfit to man the bridge. Even if I discount the testimony of the allegedly disgruntled bridge assistant, I am faced with the partially conflicting testimony of the only other witness, Louis Picou III, who was on another boat close to the bridge at the time of the accident, and Captain Jacobs.

Captain Jacobs' testimony at the trial was consistent with the statement he gave shortly after the accident and was on the whole straightforward and convincing.[2] Plaintiff finds no serious dis-

---

1. Although defendant brought its deckhand from Port Arthur, Texas, he was not called as a witness as his testimony would have been cumulative. This also applies to defendant's engineer, who was not an eyewitness to the collision. The cumulative nature of their testimony was stipulated by counsel for the Government.

2. The Government attempted on several occasions to impeach Jacobs, particularly with regard to the time estimates in his statement. However, the Court accepts Jacobs' explanation that faced as he was with an emergency, his attention was focused on the circumstances at hand, and not on a clock. His statement given

agreement with his testimony, but insists that such testimony proves he was negligent. Jacobs testified that when he left the Florida Avenue Bridge he traveled eastward at about six miles an hour over the ground, which was slow when we consider that the tide was also running eastward between three and four miles per hour. This was just enough speed to maintain steerageway. Logs of the two bridges and the tug were introduced and the times on these logs would indicate that at times between the two bridges the tug traveled in excess of six miles per hour. I conclude from all the evidence that the AJAX made good about eight miles an hour and was traveling that fast when Captain Jacobs sounded his three whistle blasts to pass through the Paris Road Bridge. The bridge logs also showed that other tugs with tows had negotiated the same distance in less time than the AJAX, and had safely passed through the bridge. Jacobs also testified that his tug and tow were incapable of making the speed suggested by the Government. In any event, the lapsed time between the bridges is not as important as the speed of the AJAX as it approached the Paris Road Bridge.

When the tug was three-quarters of a mile from the bridge, Jacobs sounded the proper three blast signal with a whistle audible in excess of one mile. In addition, a light synchronized with the whistle, flashed, which was as attractive as the whistle. Batiste, the assistant bridge tender, had originally contended in his statement that no whistle was sounded, but in his sworn testimony at trial, as well as in his deposition, he stated that the AJAX probably did sound the required signal. Mr. Picou stated that, as he had no reason to, and

was not paying any attention to the AJAX, there could have been a whistle but he didn't hear it. The only signal he recalled hearing was a three whistle signal from the bridge after the AJAX was *in extremis,* some two or three hundred feet from the bridge. It is highly unlikely that a captain of Jacobs' experience and knowledge would have neglected to signal when he had traveled the route many times and was thoroughly familiar with the crossing. I find that the AJAX gave the required three-blast signal at a proper distance from the bridge. After the signal, probably a few seconds, when he failed to receive a return signal and observing that the bridge was not opening, Jacobs sent his engineer below to reduce engine speed to "dead slow." [3] AJAX was running "dead slow" when it reached the one-half mile point.

It was at this point that the bridge usually started opening, but, for a reason not explained by the Government at trial, it did not start to open until the AJAX was about one-quarter mile from the bridge. At the one-half mile point, Jacobs realized that the bridge would not open in time and ordered full speed emergency astern. His engineer responded immediately. With AJAX's engine reversed, it caused the tug to swing its stern to port and the tow to starboard by the bow. As her forward momentum through the water was continually reduced, AJAX lost steerageway and could no longer remain in the center of the channel. AJAX was then caught crosswise in the eastbound current. Jacobs abandoned any intention of going through the draw. He was only trying to stop the tow before it crashed. The bridge did not start to open until after the AJAX went astern and was out of

some four months following the accident was necessarily based on approximations. Also, the Government in delaying so long before bringing suit, is hardly in any position to insist now on specificity which was beyond the reach of all the witnesses.

3. The Government claims it was negligent for defendant's engineer to be in the

wheelhouse. However, as the engineer timely slowed the engine of the AJAX as ordered, and remained in the engine room at all times thereafter and immediately executed all orders, particularly the order for emergency astern, I find that his prior presence in the wheelhouse, if such was a fault, to be non-contributory.

alignment in the channel. Even with the tow at an angle in the current, Jacobs was able to check his speed to one-half to one mile per hour at the time of collision.[4] The AJAX was set down on the southbound fender of the bridge by the current alone. All the evidence shows that AJAX was shaped up properly to pass through the bridge, and got out of alignment only *after* she reversed her engine.

The United States insists that Jacobs was negligent in approaching the bridge at an excessive speed; that he knew the bridge was a slow opener; that his engineer was not in the engine room when "dead slow" was ordered which caused serious delay; that this was particularly irresponsible because of the dangerous cargo the flotilla was carrying.[5] Lastly, the Government contends that the master had no right to assume that the bridge would open in time, and when Jacobs received no signal at all, a reasonably prudent pilot would have held up his tow immediately. Defendant insists that Jacobs' approach was as safe as it could be since he had to make sufficient speed to maintain steerageway and alignment to safely negotiate the bridge; that Jacobs, having properly signaled, had a right to proceed and assume the bridge would open in time; that the bridge was on notice that the AJAX was coming and was riding a fast tide which required sufficient speed necessary for it to safely pass through the bridge; that the engineer was at his station when needed, and AJAX, despite the gross negligence of the bridge almost succeeded in stopping her tow before collision, notwithstanding she was forced to assume an angle in the waterway, and was thus at the mercy of the eastbound current.

■ There are many cases which hold that a vessel, having properly sounded a signal indicating its intention to proceed through a bridge, has the right to proceed, and to assume that the bridge will be timely opened absent an appropriate warning signal from the bridge to the contrary. Clement v. Metropolitan West Side El. Ry. Co., 123 F. 271 (7 Cir.1903); Munroe v. City of Chicago, 194 F. 936 (7 Cir.1912); Dorington v. City of Detroit, 223 F. 232, 233 (6 Cir. 1915); The Majestic, 80 F.2d 879 (4 Cir. 1936); Nassau County Bridge Auth. v. Tug Dorothy McAllister, 207 F.Supp. 167 (E.D.N.Y.1962), affirmed 315 F.2d 631 (2 Cir.1963); Pennsylvania Railroad Co. v. S. S. Maric Leonhardt, 320 F.2d 262 (3 Cir.1963); N. M. Paterson & Sons, Ltd. v. City of Chicago, 324 F.2d 254 (7 Cir.1963).

In the *S. S. Marie Leonhardt,* supra, the court explained the difficulties faced by a vessel in AJAX's dilemma:

> "When the pilot of the vessel received word from the tower operator at 12:34 he had two choices: Either turn to port and drop anchor in the area immediately adjacent to the Pennsylvania edge of the channel, or time the opening of the drawspan by moving slowly up the channel and arrive at the bridge slightly after 12:40 when he expected the draw would be opened. Large vessels cannot stop immediately or hover in one spot in narrow channels by turning around in circles; they must either drop anchor or proceed above a minimum speed in order to maintain headway * * *." (Ibid, 320 F.2d at page 267)

There the S. S. MARIE LEONHARDT was 522 feet in length. Here the Tug AJAX and tow had a combined length in excess of 600 feet and the channel in question was about 125 feet wide. Thus, there was no way for the AJAX and tow to "heave to" or turn into the current. She would have been aground, across the

---

4. Picou called by the Government in rebuttal, estimated the AJAX's speed in excess of 12 m. p. h. just before collision. This estimate is rejected as Picou stands contradicted not only by Jacobs and Batiste, but by the physical facts as well.

Additionally, Picou readily admitted he was not paying any attention to the AJAX until shortly before the collision.

5. This contention has already been discussed. See footnote 3.

channel and completely at the mercy of the strong eastward current that would have pushed the entire flotilla into the full width of the Paris Road Bridge. If the AJAX had simply proceeded at "slow speed," without going astern on her engine, she would have invited collision between her lead barge and the steel pontoon of the bridge. With a cargo of gasoline, collision between steel barges is to invite disaster. As it was, she collided with the less dangerous wooden piling.

The *Clement* case is the leading authority for this doctrine and is still the law. There a vessel gave the appropriate signal but the bridge did not open in time, and despite the avoiding action taken by the vessel, she could not stop in time and the collision resulted. In finding the bridge solely at fault, the Court said:

"A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing. *If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage.* She is

not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 54 C.C.A. 94, 116 F. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Company v. City of Chicago [D.C.] 44 F. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 8 C.C.A. 86, 59 F. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern." (Ibid, 123 F. at page 273) (Emphasis supplied).

That Clement is still the law is indicated by the Third Circuit's language in Pennsylvania Railroad Company v. S. S. Marie Leonhardt, supra:

"The maritime tribunals view bridges as obstructions to navigation. The right of navigation is paramount; land traffic over the bridge is subservient thereto. Hence the rule has evolved that in approaching a drawbridge a ship having sounded proper signal may proceed on the assumption that the drawspan will be timely opened; the vessel is under no duty to heave to and critically examine the situation to satisfy itself that the drawspan is operating properly. This is not to say that a master may heedlessly steer the ship into a closed draw, but he may approach carefully on the assumption that the duties imposed upon the bridge personnel will be performed in timely fashion in the absence of a signal from the bridge to the contrary." (Ibid, 202 F.Supp. 368 at page 376)

\* \* \* \* \*

" \* \* \* A closed drawbridge without more—or the display of a visual signal indicating that the draw is closed—does not suffice to serve notice upon the pilot or master of an

approaching vessel that it will not be timely opened * * * " (Ibid, 202 F. Supp. at page 377, authorities omitted).

Plaintiff recognizes the pertinence of *Clement* and its progeny, but insists that the master may make the assumption only if he has "given the proper signal to open the bridge and (was) prudently proceeding under slow speed * * * " Clement v. Metropolitan West Side El. Ry. Co., supra.

I find that the AJAX did give the proper signal and at the critical time was prudently proceeding under reasonably slow speed considering the current underfoot.

As I said, the United States also contends that it was negligence and in violation of the law for the AJAX to proceed without receiving the "all clear" signal from the bridge. This theory is not supported by statute or jurisprudence. The United States contends that Jacobs violated 33 C.F.R. 203.240, supra, "by coming ahead before the bridge had sounded the three-blast signal." It cites Shell Petroleum Co. v. Peschken, 290 F.2d 685 (3 Cir.1961), certiorari denied, 368 U.S. 900, 82 S.Ct. 172, 7 L.Ed.2d 96, in support of that position. Those regulations do not require a vessel to stop until the bridge gives the "all clear" signal. It may require the pilot to proceed more cautiously until he does get a return signal. But Jacobs in the instant case did just that. He reduced his speed immediately, not necessarily because he didn't get a return signal but because the bridge did not begin to open. The jurisprudence following *Clement*, supra, provides that absent a warning signal from the bridge, a vessel having signaled may proceed. The cases do not require a vessel to wait for the bridge to answer before proceeding. Shell Petroleum Co. v. Peschken is in accord. That case was governed by 33 C.F.R. § 203.200 which provided for a three-blast signal in case of any delay. The vessel, the LEMBULUS, blew the appropriate signal and the bridge immediately answered with two blasts—the warning signal. This is clear from the Court's holding:

"The Lembulus disobeyed the rule * * * She signaled properly in approaching the bridge. But the bridge responded with a caution signal and under the rules that is the effective signal until removed by a three-blast signal from the bridge." (Ibid at page 687)

That the holding is in accord with *Clement* and its following, was made clear by the Third Circuit when it commented on the use of *Clement* by the trial court. " * * * The court relies on several cases where it has been said that in the absence of warning to the contrary a ship approaching a bridge may assume the bridge will be open when it arrives. Those cases are completely reconcilable with our conclusion here. Peschken, operating the Lincoln Highway Bridge, did give the warning signal." (Ibid 290 F.2d at page 687). Thus, it was negligence for the LEMBULUS to proceed in the face of a warning signal from the bridge. Those are not the facts in the instant case.

In the Nassau County Bridge Authority v. Tug Dorothy McAllister case, supra, a tug was proceeding toward a bridge with a 3-knot current underfoot, and at a speed to maintain steerageway. The tug signaled when at about 1,000 and 600 yards from the bridge. The bridge tender sounded the danger signal when the tug was only 500 feet from the bridge. The tug attempted to turn or "round up" into the current but, not having enough time or distance, she collided with both fenders. The barge in tow was loaded with gasoline and the Captain was afraid of an explosion had he collided with the steel and concrete bridge. Thus, he knew he would hit and took action to minimize the impact to avert a serious casualty.

The plaintiff there, like the United States here, contended the tug was negligent in failing to hold back until receiving the all clear signal from the bridge (which was never sounded). In

rejecting this contention as we do here, and in holding the bridge solely at fault, the trial court held:

"The libellant's claim that Holmes' attitude was frighteningly irresponsible is not sustained. Its claim that the tug clearly was at fault for failing to hold back at a safe distance from the bridge until receiving the all-clear signal, which was never given, is not sustained * * *" (Ibid 207 F.Supp. at page 174)

Plaintiff has failed to point out any statute or regulation violated by the AJAX which would require application of the Pennsylvania Rule to the activities of Jacobs. The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873).

█ There can be no doubt on the other hand that the bridge tender did not properly answer the signal of the tug, did not sound the danger signal, and failed to timely open the bridge, thereby violating the statutes and regulations governing the operation of the span. The deceased bridge tender's mental condition is irrelevant since the evidence as a whole convinces us he was grossly negligent in his operation of the bridge. Nassau County Bridge Authority v. Tug Dorothy McAllister, supra. In the Nassau County case the Second Circuit emphasized the seriousness of the single failure to timely sound the danger signal:

"Affirmed on the opinion of Judge Abruzzo in concluding that the damage was caused solely by failure of the bridge tender to give a timely danger signal. The applicable regulations, 33 C.F.R. 203.180(a), (b) and (d) (2) (i), can only be construed as requiring a prompt reply to the signal of an approaching vessel."

In the City of Cleveland v. McIver, 109 F.2d 69, 73 (6 Cir.1940), the court said:

"A bridge over a navigable stream obstructs navigation, the right to which is paramount. In recognition of this right, Congress has provided (Title 33, § 494, U.S.C.A.) that if a bridge is constructed with a draw, the draw shall be opened promptly upon reasonable signal, and (Title 33, § 499, U.S.C.A.) that the rules and regulations of the Secretary of War requiring the opening of drawbridges shall have the force of law. So it has been held that if, for any reason, a bridge cannot be opened, proper signals to that effect should be given. Clement v. Metropolitan etc., Ry. Co., 7 Cir., 123 F. 271; Great Lakes Towing Company v. Masaba S. S. Co., 6 Cir., 237 F. 577; Dorrington v. City of Detroit, 6 Cir., 223 F. 232, 243, 245."

█ Violation of its statutory duty makes the bridge presumptively negligent and liable under the doctrine of The Pennsylvania, 19 Wall. 125, 85 U.S. 125, 22 L.Ed. 148. This doctrine requires the violator to show not only that its conduct was not a contributing cause of the collision, but that it could not have been. That the Pennsylvania Rule applies to bridges is made clear by the authorities. Nassau County Bridge Auth. v. Tug Dorothy McAllister, supra; Dorrington v. City of Detroit, 223 F. 232 (6 Cir.1915); The Fort Fetterman v. South Carolina State Highway Department, 278 F.2d 921 (4 Cir.1960), certiorari denied 364 U.S. 910, 81 S.Ct. 272, 5 L.Ed.2d 225 (1960), rehearing denied, 364 U.S. 944, 81 S.Ct. 458, 5 L.Ed.2d 375 (1961); Shell Petroleum Company v. Peschken, supra; Pennsylvania R. R. Company v. S. S. Marie Leonhardt, supra; and Conners Marine Co. v. New York & Long Branch R. Co., 87 F.Supp. 132 (D.C.N.J.1950). Plaintiff produced one witness (Picou) to meet this obligation. His vague and uncertain testimony was to the effect that Jacobs only reversed his engines when he was close to the bridge. Since the only whistle he heard was the three from the bridge when the AJAX was *in extermis*, he was obviously paying little attention, which fact was admitted by Picou. Had Jacobs waited until then to reverse his engines, he undoubtedly would have crashed into the bridge pontoon with disastrous consequences. If I accept Picou's testimony concerning the bridge's three whistles,

it makes the bridge tender's negligence all the more damaging.

I find that the plaintiff violated its statutory duties in failing to timely respond to the AJAX's signal (33 C.F.R. § 203.240(b)); in failing to provide competent and attentive tenders to operate the bridge (33 C.F.R. § 203.240(a)); in failing to timely open the bridge (33 U.S.C.A. §§ 494, 499); and in failing to sound the danger signal when it was known, or should have been known, that the bridge would not be opened in time. (33 C.F.R. § 203.240(b)). Violation of its statutory duty subjected plaintiff to the burden imposed by *The Pennsylvania*, supra, which burden was not met.

The bridge operators were solely at fault for the accident in this case, and the plaintiff's suit will be dismissed at its cost.