637 F.2d 1060
 FLORIDA EAST COAST RAILWAY COMPANY, a corporation, Plaintiff-Appellant,
v.
REVILO CORPORATION, a corporation et al., Defendants-Appellees.
EXXON CORPORATION, a New Jersey corporation, Plaintiff-Appellee,
v.
FLORIDA EAST COAST RAILWAY COMPANY, Etc. et al., Defendants,
Florida East Coast Railway Co., Etc., Defendant and
Cross-Claimant-Appellant,
Revilo Corporation, Etc., Defendant and Cross-Defendant-Appellee.
 Nos. 79-1950, 79-1951.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 Feb. 26, 1981.
Rehearing Denied March 30, 1981.
 James F. Moseley, Jacksonville, Fla., for plaintiff-appellant.
 Smathers & Thompson, Richard G. Rumrell, Jr., Alan Benes Vlcek, Jacksonville, Fla., for defendants-appellees.
 Wahl & Gabel, George D. Gabel, Jr., Jacksonville, Fla., for Exxon Corp.
 Appeals from the United States District Court for the Middle District of Florida.
 Before GODBOLD, Chief Judge, and HATCHETT, Circuit Judges and MARKEY*, Chief Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 This appeal presents this circuit's first opportunity to decide whether the Pennsylvania rule, The Steamship Pennsylvania v. Troop, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), applies to a vessel/bridge allision, and if so, how the rule is to be applied. We hold that it applies and affirm.
 
 
 2
 These consolidated admiralty actions arose out of an allision between barge NBC 922 (barge), owned and operated by Revilo Corporation (Revilo) and a single span drawbridge which spans the St. Johns River, and is owned and operated by Florida East Coast Railway Company (FEC). The allision occurred while the barge was being assisted up the St. Johns River in Jacksonville, Florida, by Revilo's tug, St. Johns. FEC initiated this action in the trial court against Revilo for damages to its bridge. Revilo, filed a counterclaim against FEC for damages to its barge and tug. In a separate suit, Exxon Corporation (Exxon), owner of the cargo contained within Revilo's barge, brought an action against FEC and Revilo seeking compensation for its damaged cargo. FEC and Revilo filed cross claims against each other for indemnity, and/or contribution.
 
 
 3
 The actions were consolidated, and a trial by the court without a jury followed. The trial court awarded Exxon damages for loss of its cargo. It held that FEC was 80% responsible and Revilo was 20% responsible for damages. In this appeal, FEC assigns error to various phases of the trial court's findings of fact and conclusions of law.
 
 
 4
 The findings of fact and conclusions of law pertinent to this appeal are as follows.
 
 FINDINGS OF FACT
 
 5
 1. The Florida East Coast Railway Bridge is a double track, single span drawbridge. The FEC bridge is located on a curve in the St. Johns River and is immediately adjacent to the Acosta State Highway Bridge and 2,000 feet from the Main Street Bridge.
 
 
 6
 2. The draw span of the FEC bridge can be raised or lowered by remote control from the bridge tender's house on the bridge.
 
 
 7
 5. The plaintiff Exxon Corporation (hereinafter "Exxon") owned the 15,205 barrels of Bunker C oil on board the barge NBC 922 at the time of the collision with the FEC bridge.
 
 
 8
 6. The communication systems available at the bridge tender's house on the FEC bridge consisted of a direct telephone line to the various centers of railroad operations and a standard commercial telephone, the number for which was listed in the Jacksonville Telephone Directory. Consequently, river traffic could communicate with the FEC bridge tender by telephoning before leaving land or, while in transit, by contacting the marine operator.
 
 
 9
 7. There was no radio-telephone communication system allowing for direct communication between river traffic and the bridge tender installed on the FEC bridge prior to April 1, 1975.
 
 
 10
 8. Since 1973, the United States Coast Guard had been discussing with FEC the advisability of installing radio-telephone communication equipment in the FEC bridge tender and river traffic.
 
 
 11
 9. At approximately the same time as these discussions between the FEC and the Coast Guard were taking place, Revilo offered to install radio-telephone communication equipment on the FEC bridge, free of charge to FEC. This offer was rejected.10. The failure of FEC to install a radio-telephone communication system in the FEC bridge tender's house for communication between the bridge tender and river traffic was a contributing cause-in-fact of the collision that occurred on April 1, 1975.
 
 
 12
 11. On April 1, 1975, at approximately 2:00 a. m., the tug St. Johns and the barge NBC 922 departed from the Eastern Seaboard Terminal in Jacksonville, Florida, with a load of 15,205 barrels of Bunker C fuel oil owned by Exxon.
 
 
 13
 12. The tug and barge departed on flood tide and proceeded upriver toward Sanford, Florida. Neither the Main Street Bridge nor the Acosta State Highway Bridge were required to be raised to permit the passage of the tug St. Johns and the barge NBC 922.
 
 
 14
 13. As the tug and barge passed beneath the Main Street Bridge, the tug St. Johns properly gave three signals of its whistle to the bridge tender of the FEC bridge, then some 2,000 feet upriver, thereby requesting that the bridge be raised. The FEC bridge tender did not give the required whistle responses to the tug's signals, and the bridge remained closed.
 
 
 15
 14. Since the FEC bridge remained closed after the tug and barge had passed through the Main Street Bridge, the tug was forced to "round up" (turn to port and circle around) in order to maintain a holding position. While the tug and barge were rounding up, the tug twice again repeated the three whistle signals to the FEC bridge. The bridge failed to respond to these signals and remained closed.
 
 
 16
 15. In the bridge tender's house, the FEC bridge tender maintained a daily handwritten log noting the passage of vessels beneath the bridge and of trains over the bridge. The log contained a column entitled PSG (Proper Signal Given), which was marked with an "X" when a passing vessel gave the three whistle signals prior to passage beneath the bridge. Said log reflected the passage of the tug St. Johns with a barge on April 1, 1975, and the PSG column was marked with an "X" indicating that the proper whistle signals had been given by the tug.
 
 
 17
 16. As a result of the hazardous position of the tug and barge in the river and the futility of using whistle signals to have the FEC bridge opened, the captain of the tug radioed the Jacksonville pilot station and asked the dispatcher to telephone the FEC bridge tender and request that the bridge be opened.
 
 
 18
 17. The dispatcher from the pilot station radioed back to the tug St. Johns that the FEC bridge tender had indicated that the bridge would be opened.
 
 
 19
 18. Consequently, the tug and barge made a second approach to the bridge; however, since the bridge was not fully open, the tug and barge had to be rounded up again in order to return to a holding-type position.
 
 
 20
 19. Once the FEC bridge had fully opened, the tug and barge made a third approach to the bridge.
 
 
 21
 20. These repeated approaches and rounding-ups, plus the effects of the tide, gradually placed the tug and barge out of position for clear passage through the Acosta and FEC bridges. Consequently, the port bow of the barge struck the south draw support of the Acosta Bridge, and the corner of the starboard bow of the barge hit the north draw support of the FEC bridge.
 
 
 22
 21. The collision of the tug and barge with the Acosta and FEC bridge punctured the barge, causing Exxon's oil to be spilled into the river and causing the remaining oil in the barge to be contaminated by water that entered the barge. As a result of the loss of this cargo, Exxon suffered total damages in the amount of $34,963.35.
 
 
 23
 22. The failure of the FEC bridge tender to open the bridge in response to proper whistle signals from the tug St. Johns, or to indicate by whistle signals that the bridge would not open, and the failure of FEC to install radio-telephone communication equipment proximately contributed, to the degree of 80% to the various damages that resulted from the collision.23. Prudent upriver navigation on the St. Johns River requires that a tug and tow be maintained in full control both before and after passing beneath the Main Street Bridge. The navigational difficulties posed by flood tide conditions, in fact, mandate an even greater degree of care and control than might be otherwise necessary. When the tug St. Johns was in the vicinity of the Main Street Bridge, her captain failed to maintain control of her in a manner fully sufficient to enable him to anticipate the maneuvers that might be necessary to avert a collision when the FEC bridge is in a closed position. As a result, the court finds that Revilo proximately contributed, to the degree of 20%, to the damages that resulted from the collision in question.
 
 CONCLUSIONS OF LAW
 
 24
 4. By failing to open the draw span of the FEC bridge in response to the whistle signals by the tug St. Johns, FEC, as the owner and operator of the bridge, violated its statutory duty to raise the draw span of the bridge promptly after reasonable signals were given by an approaching vessel. 33 U.S.C. §§ 494, 499 (1976). FEC also violated various duties created by the federal regulations promulgated pursuant to 33 U.S.C. § 449. These regulations require the bridge to respond to the whistle signals of an approaching vessel, thereby indicating that the bridge will not open. 33 C.F.R. § 117.240 (1976). Additionally, the federal regulations require the bridge owner to provide a drawbridge with the necessary tenders and the proper mechanical appliances for the safe, prompt, and efficient opening of the draw. 33 C.F.R. § 117.240(a) (1976). As imposed on bridge owners, this duty has been interpreted to make such bridge owners proportionately liable under the "Pennsylvania Rule", see, The Pennsylvania, 85 U.S. (19 Wall.) 125 (22 L.Ed. 148), (1874), if such bridge owners fail to provide the bridge with "competent and attentive tenders to operate the bridge." United States v. Sabine Towing and Transportation Company, 289 F.Supp. 250, 261 (E.D.La.1968). See 33 C.F.R. § 117.240 (1976). As a result of the FEC bridge tender's inattentiveness to river traffic, FEC violated its statutory and regulatory duties.
 
 
 25
 5. The statutory violations by FEC render it presumptively negligent and liable under the doctrine of The Pennsylvania, 85 U.S. (19 Wall.) 125 (22 L.Ed. 148) (1874). The Pennsylvania Rule requires the violator of a statute to show not only that its conduct was not a contributing cause of the collision, but that it could not have been a cause of the collision. Id. at 138. The Pennsylvania Rule clearly applies to bridges as well as vessels. FEC has failed to rebut this presumption by showing that its conduct was not a contributing cause of the collision between the tug St. Johns and the barge NBC 922 and the FEC bridge. As the conduct of FEC was a substantial contributing cause of said collision, FEC is liable for 80% of the damages incurred as a result of the collision.
 
 
 26
 6. Even though the FEC bridge was not required by statute to have a radio-telephone communication system, FEC breached its duty of due care in the operation of a drawbridge by failing to heed the requests of the United States Coast Guard, Revilo, and other members of the maritime community to install on the bridge a radio-telephone to monitor Channel 13. The existing communication system on the bridge was inadequate for FEC to meet its duty of care under the circumstances of this case. Consequently, the negligence of FEC that contributed to the collision of the tug and barge with the bridge was due in part to FEC's failure to install a radio-telephone communication system on its bridge. See 33 U.S.C. §§ 494, 499 (1976).
 
 STATEMENT OF ISSUES
 
 27
 The issues raised by this appeal are: (1) whether the trial court misapplied the Pennsylvania rule; (2) whether the Pennsylvania rule is applicable to bridge/vessel allisions; (3) whether United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), precludes application of the Pennsylvania rule; (4) whether the trial court's findings of fact are clearly erroneous; (5) whether the trial court erred in finding that FEC had a duty to install a radio-telephone communication system on the bridge; and (6) whether the district court erred in calculating the damages of FEC.
 
 
 28
 * FEC argues that the trial court misapplied the Pennsylvania rule, The Steamship Pennsylvania v. Troop, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), in that it construed the rule as a rule of liability rather than a procedural rule which shifts the burden of proof on the issue of causation. Green v. Crow, 243 F.2d 401 (5th Cir. 1957).
 
 
 29
 Under the Pennsylvania rule, the violator of a statutory rule intended to prevent allisions has the burden of proving not only that its transgressions were not a contributing cause of the allision, but that they could not have been a cause of the allision. 86 U.S. at 138; Reyes v. Vantage S.S. Co., 609 F.2d 140 (5th Cir. 1980); People of State of California v. Italian Motorship Ilice, 534 F.2d 836 (9th Cir. 1976). In applying the Pennsylvania rule, the trial court found that FEC had (1) failed to open the drawspan of the FEC bridge in response to whistle signals by the tug, St. John, in violation of 33 U.S.C. §§ 494,[1] 499,[2] (2) failed to respond to whistle signals of an approaching vessel, thereby indicating that the bridge would not be opened, in violation of 33 C.F.R. § 117.240,[3] and (3) failed to provide a drawbridge with competent and attentive tenders to operate the bridge, in violation of 33 C.F.R. § 240(a).[4] These violations, according to the trial court, rendered FEC "presumptively liable under the doctrine of the Pennsylvania." Finding that FEC had failed to rebut this presumption by showing that its conduct was not a contributing cause of the allision, the trial court held that FEC's transgressions were a substantial contributing cause of the allision. This is a proper application of the Pennsylvania rule. E. g., Gele v. Chevron Oil Co., 574 F.2d 243 (5th Cir. 1978).
 
 
 30
 FEC's argument under Green is misplaced. In Green, both plaintiff and defendant were guilty of statutory violations designed to prevent allisions. The trial court, however, found that the defendant was solely responsible for the allision and therefore assessed damages against the defendant. On appeal, the defendant argued that the plaintiff was presumptively liable under the Pennsylvania rule and should share the damages. In order to avert the harsh result that the Pennsylvania rule could have when a party's statutory violations do not contribute to the allision this court held that the Pennsylvania rule does not automatically create liability. It merely "creates a shifting of the burden of proof as to causation." 243 F.2d at 403. Thereafter, this court stated that the trial court found that the defendant's shrimp troller was wholly at fault and that its negligence was sufficient in itself to account for the allision. Under these circumstances, the trial court was not required to assess damages against the plaintiff in the name of the Pennsylvania rule.
 
 
 31
 The harsh result averted in Green is not a factor in this case. Here, only FEC violated statutory and regulatory duties intended to prevent allisions. The trial court placed the burden upon it to rebut the presumption of fault. Finding that FEC had not rebutted the presumption, and that its conduct was a "substantial contributing cause of the allision," the court found FEC liable. Based upon this finding, the trial court was justified in assessing fault and damages against FEC using the presumption created by the Pennsylvania rule. Green is inapplicable to this case.[5]
 
 II
 
 32
 Next, FEC argues that the Pennsylvania rule, as construed by the Fifth Circuit only applies in the context of ship allisions. As such, FEC asserts that the trial court erred in applying the rule to this case. We disagree.
 
 
 33
 As recently as 1978, this court held that the Pennsylvania rule "is applied not only to ships, but also to those who do not properly mark an object in navigable waters." Gele v. Chevron Oil Co., 574 F.2d 243 (5th Cir. 1978). This court has also applied the Pennsylvania rule in other contexts. E. g., Reyes v. Vantage S.S. Co., 609 F.2d 140 (5th Cir. 1980) (Jones Act case in which this court approved application of the Pennsylvania rule to a shipowner who failed to have rescue devices on board his ship in violation of 46 C.F.R. 94.95-20(a)).[6] Although this court has never applied the Pennsylvania rule to allisions involving bridges and vessels, the trial courts within this circuit have applied the rule to bridge/vessel allision. Southern Pacific Transportation Co. v. Tug Capt. Vick, 443 F.Supp. 722 (E.D.La.1977); United States v. Sabine Towing and Transportation Co., 289 F.Supp. 250 (E.D.La.1968). Other circuits have also applied the Pennsylvania rule to bridge/vessel allisions. Office of Communication v. FCC, 560 F.2d 529 (2d Cir. 1977); Feeder Line Tow Serv., Inc. v. Toledo P. and W. R. R. Co., 539 F.2d 1107 (7th Cir. 1976).
 
 
 34
 We hold that the Pennsylvania rule may be applied to bridge/vessel allisions. The trial court correctly applied the rule under the facts of this case.
 
 III
 
 35
 FEC argues that the Supreme Court decision in United States v. Reliable Transfer, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), renders unnecessary any consideration of the Pennsylvania rule. FEC therefore urges this court to discard the rule in this circuit.
 
 
 36
 Before the Supreme Court decision in Reliable Transfer, any vessel guilty of a statutory violation intended to prevent allisions was responsible for one-half of the damages sustained. In Reliable Transfer, however, the Supreme Court discarded the so called divided damages rule for a more equitable rule requiring the allocation of liability for damages in proportion to the relative fault of the parties involved.
 
 
 37
 The proportional liability rule announced in Reliable Transfer does not render unnecessary consideration of the Pennsylvania rule. "The rule still cast fault upon a party who has violated a statute and cannot overcome the heavy presumption(.) (I)n view of Reliable Transfer, (however), that fault must now be measured in its proportionate degree." Southern Pacific Transportation Co. v. Tug Capt. Vick, 443 F.Supp. 722, 732 (E.D.La.1977).
 
 
 38
 The trial court found that FEC was guilty of statutory violations. Applying the Pennsylvania rule, it concluded that FEC had not sustained its burden under the rule. In light of Reliable Transfer, the trial court found that FEC was 80% liable for the damages sustained. The trial court properly applied the rule in light of Reliable Transfer.
 
 IV
 
 39
 FEC next challenges the trial court's finding that FEC's statutory violations substantially contributed to the allision in question.
 
 
 40
 The finding of fault in a maritime allision is primarily a fact issue to which the clearly erroneous standard applies. Movible Off-shore Inc. v. M/V Wilken A. Falgout, 471 F.2d 268, (5th Cir. 1973). Therefore, this court may not disturb the trial court's findings of fact unless they are clearly erroneous. Having reviewed the record and the party's contentions, we find that the trial court's findings are supported by substantial evidence and are not clearly erroneous.
 
 V
 
 41
 FEC argues that the trial court erred in concluding that FEC had a duty to install a radio/telephone communication system on the bridge. It asserts that the trial court's conclusion is erroneous as a matter of law, in light of the fact that FEC was not required by statute to have a radio on its bridge.
 
 
 42
 While FEC's argument is persuasive, we find that any error shown regarding radio communications does not warrant reversal under the circumstances of this case. The trial court found that FEC violated three statutory duties, and that FEC's transgressions were the substantial contributing cause of the allision. We hold that these findings are sufficient to sustain the trial court's finding of causation.
 
 VI
 
 43
 Finally, FEC challenges the trial court's finding regarding the allocation of damages. First, FEC asserts that damages in this action were awarded without a joint survey. Damages awarded without a joint survey are to be viewed with suspicion. Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F.2d 128 (5th Cir. 1972). Second, it argues that the trial court's failure to specify how the trial court awarded damages renders them speculative.
 
 
 44
 In an admiralty action, the trial court's findings of damages are matters of fact and should be affirmed if not clearly erroneous. Gele v. Wilson, 616 F.2d 146 (5th Cir. 1980). With regard to FEC's argument under Delta Marine Drilling Co., this court stated that claims for damages are to be viewed with suspicion if the party charged with liability is not given notice of the survey of damages. This court, however, noted that "lack of a joint survey is not fatal." Id. at 130. FEC does not point out, nor have we found, any evidence in the record that would indicate that it was prejudiced by the lack of a joint survey. With respect to FEC's argument that the trial court's award of damages was based upon speculation, we find sufficient support in the record to sustain the trial court's award of damages. The trial court's findings of fact regarding damages are not clearly erroneous.CONCLUSION
 
 
 45
 We hold that (1) the trial court did not misconstrue the Pennsylvania rule; (2) the Pennsylvania rule applies to bridge/vessel allisions; (3) the Pennsylvania rule survived the Supreme Court's decision in United States v. Reliable Transfer, and is therefore still alive in this circuit as a procedural device which shifts the burden of proof on the issue of causation; (4) the trial court's findings of fact are not clearly erroneous; (5) the trial court's finding that FEC breached its duty to install a radio-telephone communication system on its bridge does not constitute reversible error; and (6) the trial court's findings of fact regarding the allocation of damages are not clearly erroneous.
 
 
 46
 AFFIRMED.
 
 
 
 *
 Of the U.S. Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 33 U.S.C. § 494 provides, in pertinent part:
 No bridge erected or maintained under the provision of sections 491 to 498 of this title, shall at any time unreasonably obstruct the free navigation of the waters over which it is constructed ....
 If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft ....
 
 
 [2]
 33 U.S.C. § 499 provides, in pertinent part:
 It shall be the duty of all persons owning, operating, and tending the drawbridges built across the navigable rivers and other waters of the United States, to open, or cause to be opened, the draws of such bridges under such rules and regulations as in the opinion of the Secretary of Transportation the public interests require to govern the opening of draw bridges for the passage of vessels and other water crafts, and such rules and regulations, when so made and published, shall have the force of law ....
 
 
 [3]
 33 C.F.R. § 117.240(b)(2) provides:
 When the draw of the bridge cannot be opened immediately or when the bridge is open and is to be closed immediately, the drawtender shall reply by four or more short, distinct blasts of a whistle or horn, by four or more calls through a megaphone, or by four or more loud and distinct strokes of a bell (danger signal).
 
 
 [4]
 33 C.F.R. § 117.240(a) provides:
 (a) Corporations or persons owning or controlling a drawbridge shall provide the same with the necessary tenders and the proper mechanical appliances for the safe, prompt, and efficient opening of the draw for the passage of vessels.
 
 
 [5]
 The trial court's use of the language, "presumptively liable" is not critical within the context of this case. This language has been used before in construing the meaning of the Pennsylvania rule. E. g., Dow Chemical Company v. Dixie Carriers, Inc., 463 F.2d 120, 122 n. 5 (5th Cir. 1972) (then Chief Judge Brown stated: "Although it might be argued that Dow's statutory violation rendered it presumptively liable for damages ...") (emphasis added); and United States v. Sabine Towing, 289 F.Supp. 250, 260 (E.D.La.1968) (violation of its statutory duty makes the bridge presumptively negligent and liable under the doctrine of The Pennsylvania.") (emphasis added). FEC's semantic attack on the trial court's use of the language "presumptively liable" is unacceptable
 
 
 [6]
 46 C.F.R. § 94.95-20(a) provides, in pertinent part:
 The line-throwing appliance and its equipment shall be kept easily and readily accessible and ready for use. No part of this equipment shall be used for any other purpose.