**STATE OF CONNECTICUT, Plaintiff,**

v.

**TUG CYNTHIA MORAN, her engines, boilers, tackle, etc.; TUG CYNTHIA MORAN, INC.; and Moran Towing & Transportation Co., Inc., Defendants and Third-Party Plaintiffs,**

v.

**CONSOLIDATED RAIL CORPORATION, Third-Party Defendant.**

No. H–80–465.

United States District Court, D. Connecticut.

Oct. 2, 1984.

---

Burlingham Underwood & Lord by W. Thaddeus Miller, Robert B. Pohl, New York City, for defendants & third-party plaintiffs.

Cooney, Scully & Dowling, by Patrick J. Flaherty, Maura A. Chase, Hartford, Conn., for third-party defendant.

MANSFIELD, Circuit Judge: *

This is an action by the State of Connecticut ("State") against the Tug Cynthia Moran (the "Tug"), Tug Cynthia Moran, Inc. (the "Tug Company"), and Moran Towing & Transportation Co., Inc. ("Moran"), for damages caused to the fendering system of the Moses Wheeler Bridge ("I–95 Bridge"), owned by the State, when the bridge was hit by the barge Sea Horse I ("Barge"), proceeding north on the Housatonic River by Devon, Conn. on July 31, 1978, in push tow of the Tug. The Tug Company, a Delaware corporation, was at all relevant times the owner of the Tug. Moran, a New York corporation, was the bareboat charterer of the Tug. Jurisdiction over the subject matter, an admiralty and maritime claim, exists pursuant to Title 28 U.S.C. § 1333. The State claims that it suffered $205,000 damages to its bridge fender as a result of the negligent operation of the Tug and Barge.

The defendants filed a third-party complaint against Consolidated Rail Corporation ("Conrail") claiming that it is liable in whole or part for the allision because of the negligence of the tender of a Conrail-owned bridge (the "Railroad Bridge"), located approximately 50 yards to the north of the I–95 Bridge. The tender allegedly failed to open the leaves of the Railroad Bridge in time, as he had represented that he would

* Of the United States Court of Appeals for the Second Circuit, sitting by designation.

do and therefore caused the Tug and Barge to change course in order to avoid a collision with the Railroad Bridge and thus to strike the I–95 Bridge fender.

On September 11, 1984, the defendants settled the State's claim against them. The defendants' third-party claim against Conrail was bifurcated and on September 17, 1984, the issue of liability was tried before me, sitting without a jury. The following constitute my findings of fact pursuant to Rule 52(a), F.R.Civ.P., and conclusions of law with respect to the issue of liability.

The Tug is a single screw steel motor tug of 239 gross tons and 162 net tons built in 1957. It is 100.25′ in length, 27′ breadth and 15′ depth, and has a diesel engine producing about 1,757 h.p. with pilot house control. The Barge is a tank barge 290.1′ in length, 60′ breadth and 18.5′ depth.

On July 31, 1978, the Tug carried a crew of six men, namely a master, mate, engineer, two deck hands and a cook, all employed by Moran and all competent and qualified. The Tug was seaworthy and adequately manned and equipped for the towing of barge Sea Horse I.

The I–95 Bridge spans the Housatonic River near the City of Devon. It is an unmanned fixed bridge located wholly within the State of Connecticut and has a fender system on the east and west sides of the channel. These fenders parallel the outer boundaries of the draw under the bridge.

The I–95 Bridge and its fender system were constructed by the State pursuant to a permit and plans issued under the Federal General Bridge Act of 1946 and signed on behalf of the Chief of Engineers on February 25, 1955, and on behalf of the Secretary of the Army on February 28, 1955. The State owns the I–95 Bridge and its fender system and is responsible for their maintenance.

Conrail owns, operates and maintains the Railroad Bridge, which spans the Housatonic River and is located about 50 yards north of the I–95 Bridge. The Railroad Bridge is a bascule type bridge consisting of two parallel leaves. The end of the leaves touching on the west side of the river are fixed so that the east side of the leaves raise when the Bridge is placed in an elevated position. It is necessary for the Railroad Bridge to elevate its leaves for tugs and barges to proceed upriver north of that Bridge.

Approximately 525 to 535 yards south of the I–95 Bridge is the Devon Highway Bridge ("Highway Bridge"). The Highway Bridge is a bascule type bridge which also spans the Housatonic River. When proceeding northbound on the Housatonic River, a vessel must pass through the draw of the Highway Bridge in order to make its approach up the river to the I–95 Bridge, thence to proceed through the draw of the Railroad Bridge.

At about 8:00 A.M. on July 31, 1978, the Tug with the Barge in push tow ahead arrived at Buoy #1 at the mouth of the Housatonic River on Long Island Sound. The captain was William E. Clifford, an experienced and licensed master and navigator of tugs, who had towed barges on about 100 occasions prior to the accident in this case, including 50 or more trips up the Housatonic River, of which approximately 12 trips were with the Barge (Sea Horse I) in tow. The mate of the Tug on the present voyage was Bruce Allen, also well experienced in freight towing. At all times in question Clifford acted as pilot and Allen as lookout and both were in the wheelhouse of the Tug. The tow arrangement was one whereby the bow of the Tug was fitted into the stern of the Barge, which had been notched for that purpose, and the Barge and Tug were held together by cables tightened by winches. The total overall length of the Barge (290 + feet) and Tug (100 + feet) was reduced about 20 feet by the depth of the Barge's notch, into which the bow of the Tug fitted.

Upon arriving at Buoy #1 Clifford communicated by VHF radio channel 13 with the drawbridge operators of the Highway Bridge and the Railroad Bridge, respectively, advising them that the Tug and Barge would be at their bridges in about an hour.

Each bridge tender responded that he would be ready.

At about 8:50 A.M. the flotilla consisting of the Barge and Tug arrived near Buoy #23, just south of the Highway Bridge. Clifford first advised the Highway Bridge operator by VHF radio that he was now making his approach and was told that that drawbridge operator would open the Highway Bridge, which he did. Immediately after talking with the Highway Bridge operator, Captain Clifford contacted the Railroad Bridge operator, informed him of the flotilla's location, and was advised that the Railroad Bridge would be "going up," i.e., opening so that the flotilla could pass through. Then, at about 9:05 A.M. or 9:10 A.M. Clifford, as he was entering the draw of the Highway Bridge, again communicated by his VHF radio, channel 13, with Robert Giannotti, the drawbridge operator of the Railroad Bridge, who had seen the flotilla and the Highway Bridge being raised, and had overheard the conversation between Clifford and the drawbridge operator of the Highway Bridge. Clifford advised Giannotti that he was making his "final approach." Giannotti again replied that he would be "going up."

At both times when Giannotti assured Clifford that the Railroad Bridge would be open when the Tug and Barge reached it, Giannotti had not yet obtained the authority to open it. To obtain that permission he first had to telephone the Railroad's nearest tower operator, Edward Mattler, located some 1,500 yards away on the line. Mattler, in turn, had to obtain telephone permission from a railroad train dispatcher, located in New York. Since the opening of the Railroad Bridge must be coordinated with the passage of trains across the bridge and since the New York train dispatcher sometimes was busy handling other train scheduling instructions, clearance to open the Railroad Bridge might sometimes be delayed indefinitely.

When the Tug and Barge were entering the Highway Bridge draw, Giannotti did not radio Clifford that permission had not yet been obtained to open the Railroad Bridge but instead indicated that there was no such problem by assuring Clifford that the Railroad Bridge would be opened. After carefully observing Giannotti I find myself unable to credit his testimony that he simply told Clifford in response to his radioed request for an opening that he (Giannotti) "would see what he could do." I am satisfied that he led Clifford to believe that the Railroad Bridge would be open when the Tug and Barge got to it. Giannotti's testimony on this issue conflicts with that of Clifford and Allen, the captain and mate, respectively, of the Tug, which I credit. Since a train was scheduled to cross the Railroad Bridge at 9:07 A.M., and did pass over that bridge at 9:11 A.M., and the next train was not scheduled to pass until 9:29 A.M., Giannotti may have believed that permission to open the Railroad Bridge would be obtained before the Tug reached it, which would be at approximately 9:20 A.M. However, such permission was not obtained by him until 9:30 A.M.

In the meantime, believing that the Railroad Bridge would be opened when he reached it, Clifford did not stop at the Highway Bridge and tie up to it, which he would have done if he had been advised that Giannotti had not yet obtained permission to open the Railroad Bridge. Instead the flotilla passed through the opened Highway Bridge draw northward toward the Railroad Bridge, some 575 to 585 yards away. As they passed through the Highway Bridge, Clifford and Allen found that their view of the draw leaves of the Railroad Bridge was partially obstructed by the Highway Bridge and the stanchions and fenders of the I–95 Bridge, so that they could not at that point determine whether the leaves were being raised. Posting of a lookout on the bow of the barge would not have improved visibility since the barge's bow was only about 9 feet above water level and more likely to have its line of sight blocked by the fenders than that of the pilot house which was 25 feet above water level. Visibility was also hampered by the fact that as the Housatonic goes northward from the Highway Bridge it turns about 30° in a dogleg to the left at a

point about halfway to the Railroad Bridge. Although visibility is better from the center of the top of the Highway Bridge, which is about 35–40 feet above the water at flood tide, the Tug's wheelhouse, where Clifford and Allen were located, was only 25 feet above the water, or approximately 10–15 feet lower than the top of that bridge.

As the flotilla passed through the Highway Bridge toward the Railroad Bridge the Tug proceeded at dead low speed (less than 1 knot per hour) with additional speed of approximately 1 knot from the flood tide flowing upriver, giving the flotilla a land speed of less than 2 knots per hour.

When the flotilla reached a point about one-third of the distance from the Highway Bridge to the Railroad Bridge, Clifford and Allen were able to see for the first time that the Railroad Bridge had not been opened. Clifford immediately radioed Giannotti asking him to open the bridge. Giannotti replied for the first time that a call had been made to New York for permission to open the bridge and that he could not open the bridge until permission was received. Clifford then told Giannotti that he should open the bridge or else the barge might hit it. At the same time Captain Clifford immediately stopped the engines of the boat. The flotilla began to slow down, but continued to drift upriver for approximately 5 minutes. Clifford next put the Tug's engines at full astern, which caused the Tug to move toward its port side and the bow of the barge to veer to the right. He followed with a "back and fill" maneuver, alternately putting the engine speed forward and in reverse in an effort to straighten out and slow down the barge. The barge, however, continued to veer slowly to the right and struck the I–95 fendering system at a point between the I–95 Bridge and the Railroad Bridge, causing damage to that system. The barge then was backed out and halted with its port side by the opposite fender on the west side of the river and with its bow under the Railroad Bridge. There a deck hand put out a line, which held the flotilla in position until the Railroad Bridge was finally opened, which did not occur until 9:30 A.M. The flotilla then passed through the draw and the bridge was closed at 9:38 A.M.

The action taken by Captain Clifford upon finding that the Railroad Bridge was not open and would not be opened for an indefinite period of time represented prudent seamanship under the circumstances with which he was faced. Until he saw that the Railroad Bridge was not opened or being opened he was entitled to rely on that bridge operator's statement made a few minutes earlier that he was opening up the bridge. At the point where Clifford first discovered that the bridge was closed, he was justified in stopping the Tug's engines and waiting for several minutes before commencing the back and fill procedure, which could be attempted more safely between the fenders of the I–95 Bridge than in the open stretch of the river since the fenders could be used to check the right swing of the bow of the barge that would be caused by backing the tug full astern. He could not safely attempt to anchor the Tug and turn the flotilla around. Until the flotilla was slowed down a dropped anchor might tear a hole in the bottom of the barge. An anchor might also foul underwater cables on the bottom. The flood tide also might have swept the flotilla up against the I–95 Bridge or might have run it aground. The channel was only 450 feet wide and the flotilla approximately 390–400 feet long, in addition to which the anchor line could add another 80 feet to 90 feet to the length. The depth·of the water west of the channel varied from 5 feet to 12 feet at mean low tide, although under the conditions that existed at the time of the accident, the depths would have ranged from 10 feet to 17 or more feet. The barge, on the other hand, drew 16–17 feet and the Tug 15 feet. On the issue of the prudency of Capt. Clifford's maneuver under the circumstances I credit the expert testimony of Capt. Jim M. Jenkins and reject that of Capt. Richard H. Riley, whose only experience piloting on that stretch of

the Housatonic River took place 20 years ago.

## CONCLUSIONS

The accident in which the Barge struck the fendering system of the I–95 Bridge was caused solely by Conrail's negligence in not opening the Railroad Bridge in time for the flotilla to pass through that bridge after Capt. Clifford signalled by radio that his flotilla wished to pass and the bridge operator represented to Capt. Clifford that the Railroad Bridge would be timely opened for passage.

Conrail owed a duty, upon being requested for an opening, either to advise the captain of the flotilla that it could not assure that the bridge could be opened in time for prompt passage as requested or to open the bridge as requested. Title 33 U.S.C. §§ 494, 499, 512; *Nassau County Bridge Auth. v. Tug Dorothy McAllister*, 207 F.Supp. 167, 170–71 (E.D.N.Y.1962), *aff'd*, 315 F.2d 631 (2d Cir.1963); *Fla. East Coast Ry. Co. v. Revilo Corp.*, 637 F.2d 1060, 1064 (5th Cir.1981).[1] The failure of the Railroad Bridge operator to so advise the Tug captain or to open that bridge on time as he had represented that he would do violated Conrail's duty. Indeed, his response to Capt. Clifford's request amounted to an invitation to the flotilla to proceed and entitled Clifford reasonably to believe that the Railroad Bridge would be promptly opened for the flotilla's passage. *Pennsylvania Railroad Co. v. S.S. Marie Leonhardt*, 202 F.Supp. 368, 378 (E.D.Pa.1962), *aff'd*, 320 F.2d 262 (3d Cir.1963); *Clement v. Metropolitan West Side El. Ry. Co.*, 123 F. 271, 273 (7th Cir.1903). If the Railroad Bridge operator had opened that bridge as he was obligated to do under the circumstances the flotilla would have passed through the bridge without accident.

There was no contributory fault or negligence on the part of the Tug and third-party plaintiffs. The Tug followed the correct procedure in making a timely request for opening of the Railroad Bridge. Capt. Clifford reasonably relied on the bridge operator's statement that the bridge would be opened. He was not negligent in failing to learn at an earlier time that the bridge would not be timely opened. Nor was he negligent in not posting a lookout at the barge's bow since doing so would not improve line-of-sight visibility to the Railroad Bridge over that from the pilot house. *See The Mamei*, 152 F.2d 924, 929 (3d Cir.1945), *cert. denied*, 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611 (1946). When he first saw that the bridge was closed and learned that it would not be opened in time for the flotilla to pass without incident he took all reasonable precautions and exercised prudent seamanship to avoid a collision but he was unable to do so only because of the bridge operator's negligence in failing to timely advise him that the bridge would not be opened in time for the flotilla to pass as orally scheduled.

Judgment shall be entered in favor of the third-party plaintiffs against Conrail on their claim that Conrail is liable for damages sustained by them as a result of the allision.

Unless the issue of damages is disposed of by settlement with Conrail the issue will be tried on October 22, 1984. The parties are requested to advise the court on or before October 10, 1984, whether trial of the damages issue will be necessary.

It is so ordered.

---

1. The case for holding Conrail liable is stronger in view of Conrail's breach of its statutory duty to open the bridge in a timely manner. *See* 33 C.F.R. § 117.125(b). This breach gives rise to a presumption that Conrail's fault was "at least a contributory cause of the disaster" and shifts to Conrail the burden of proving that the breach "could not have been" a cause of the accident. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). Although Conrail did not rebut this presumption, I find no need to rely on the *Pennsylvania* rule in reaching my decision in the case since without the rule the evidence establishes that the allision was caused solely by its negligence.