GALVESTON COUNTY NAVIGATION
DISTRICT NO. 1, Plaintiff,

v.

HOPSON TOWING CO., INC., Hopson
Transportation, Inc., Hopson Marine
Transportation, Inc., and M/V Miss
Sandy, its Engines, Tackle, Equipment,
Machinery, Gear, Furniture, Apparel,
Appurtenances, etc., Defendants.

Civ. A. No. G–94–149.

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 28, 1995.

Michael L. Wilson, Rider & Wilson, Galveston, TX, for plaintiff Galveston County Navigation Dist. No. 1.

Robert Stevens De Lange, Royston Rayzor Vickery & Williams, Galveston, TX, for defendants Hopson Towing Co., Inc., M/V MISS SANDY, its engines, tackle, equipment, machinery, gear, furniture, apparel, appurtenances, etc.

*SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW*

KENT, District Judge.

This cause came on regularly for trial before the Court sitting without a jury, on February 9, 1995. The attorneys for all parties were present. After considering the pleadings, the evidence, and the argument of counsel, in addition to the findings and conclusions announced from the bench, at the end of trial, the Court makes its findings of fact and conclusions of law supplementally as follows:

**FINDINGS OF FACT**

1. Galveston County Navigation District No. 1 ("Plaintiff") owns, maintains, and operates a bridge named the Herbert E. Schmidt Causeway between Galveston Island and Pelican Island in Galveston Bay, Galveston County, Texas ("bridge").

2. Defendant Hopson Transportation, Inc. ("Hopson") is a corporation organized and existing under the laws of the State of Louisiana; on March 11, 1993, it was the owner and operator of the M/V Miss Sandy, official number 628797, which is a documented vessel of the United States ("Miss Sandy"). Defendant Hopson Marine Transportation, Inc. ("Hopson Marine") is a corporation organized and existing under the laws of the State of Louisiana and is the present owner of the Miss Sandy.

3. Hopson Towing Co., Inc. has never been an owner or an operator of the Miss Sandy.

4. On March 11, 1993, the Miss Sandy, a moving vessel, was pushing two barges in tow when one of those barges struck and damaged various portions of the traffic fender system of Plaintiff's bridge. Said traffic fender system is an immovable object.

5. Plaintiff has carried its burden of proving that all of the standard operating procedures for its bridge are reasonable, usual and customary and comply with the applicable statutory requirements and requirements of the Code of Federal Regulations. Such standard operating procedures include (a) communicating with a vessel upon receipt of a proper signal; (b) commencing the process of checking and stopping vehicular traffic crossing the bridge when a vessel has reached a particular landmark, that is, approximately ½ mile from the bridge, at Piers 39–40; (c) completing the raising of the bridge to an open, fixed position before a vessel passes

another specific landmark, that is, the sulfur dock, which is approximately ¼ mile from the bridge; and (d) initiating the process of stopping vehicular traffic, implementing safety devices to prevent damages to vehicular traffic, and causing the bridge to be raised to an open, fixed position.

6. Plaintiff has carried its burden of proving that with respect to the Miss Sandy on March 11, 1993, Plaintiff's bridge was operated reasonably and in compliance with its standard operating procedures and the applicable statutory requirements and requirements of the Code of Federal Regulations. Immediately upon receipt of a proper signal from the Miss Sandy, Plaintiff's bridge tender began the process for opening the bridge and did not unreasonably delay the raising of the bridge. No vehicular traffic or any other condition materially delayed the opening of the bridge for the Miss Sandy. Plaintiff's bridge was open in a timely manner for the passage of the Miss Sandy and her tows. Plaintiff's bridge had been raised to an open, fixed position before the front of the lead barge being pushed by the Miss Sandy passed the sulfur dock, which is approximately ¼ mile from the bridge.

7. There was no negligence by Plaintiff, no intentional wrongdoing by Plaintiff, and no violation of any applicable statute or regulation by Plaintiff in relation to this allision.

8. No act or omission on the part of Plaintiff's bridge caused or contributed to the causation of the casualty involving the Miss Sandy in any way.

9. There is no evidence that Plaintiff's bridge is inherently dangerous, constitutes an unreasonable risk or hazard to navigation, or is improperly constructed or maintained. There is absolutely no testimony in this case that there was any malfunction of the bridge.

10. Before the allision, the Miss Sandy did not properly communicate its intentions in approaching Plaintiff's bridge and did not communicate its apprehensions, in view of Defendants' unproved allegations that the Miss Sandy became apprehensive that the bridge would not be timely opened.

11. Captain Ebert of the Miss Sandy made no complaint concerning the operation of the bridge immediately after the allision, despite a reasonable opportunity to communicate with Plaintiff's bridge at that time and although a reasonable person in a condition where he felt himself to be aggrieved would clearly have done so. The version of the facts submitted by Captain Ebert in his accident report to the U.S. Coast Guard after the fact are unpersuasive.

12. The testimony of Captain Borres, who was present in the wheelhouse of the Miss Sandy at all material times, with respect to distances was incredible and internally inconsistent. At one point, he testified that the bridge was in an open, fixed position when the Miss Sandy was coming by a pier; since the last pier before the bridge is the sulfur dock, located approximately 1440 feet from the bridge, such testimony supports the evidence provided by Plaintiff's bridge tenders. However, Captain Borres stated in response to the question of Defendants' attorney that the bridge began to open when the Miss Sandy was 600 to 800 feet away from the bridge, which estimate is contradicted by both of Plaintiff's bridge tenders.

13. The testimony of Captain Ebert, who was navigating the Miss Sandy at all material times, with respect to distances was incredible. Captain Ebert estimated that the sulfur dock was ½ mile away from the bridge, when in fact it is 1440 feet away; consequently, all of his distance estimates are suspect. Further Captain Ebert's estimates of Miss Sandy's distance from the bridge in relation to its opening are contradicted by both of Plaintiffs' bridge tenders.

14. Further, the testimony of Captain Ebert contradicts that of Captain Borres. Captain Borres had stated that the Miss Sandy was in idle when slowing down, did not encounter a hazardous condition near the bridge, and did not shift to neutral right before the allision; he also said that the current did not change direction at the bridge. In contrast, Captain Ebert did not state that the Miss Sandy was in idle when slowing down, asserted that he did encounter a hazardous condition near the bridge, and claimed he did shift to neutral when he was about to strike the traffic fender system;

**366**

moreover, he declared that the current changed directions at the bridge.

15. Mr. Earl Hatfield, a witness in the tower of Plaintiff's bridge, testified that Plaintiff's bridge tenders in the bridge tower indicated that they knew that the Miss Sandy was approaching, were taking steps to accommodate the Miss Sandy's passage through the bridge, delayed dealing with Mr. Hatfield's business involving a prior casualty until they had completed the responsibilities of allowing the Miss Sandy to pass, were purposeful and workmanlike in their habits and the manner in which they performed their duties, and did not appear to be acting in a cavalier or frivolous manner.

16. The testimony of Mr. Earl Hatfield with regard to the distance of the Miss Sandy from the Pelican Island Bridge was incredible, since any recollection was not brought to his attention until 18 months after the casualty, and, in the circumstances, Mr. Hatfield was asked to remember, in effect, a non-event.

17. It is remarkable and incredible that Mr. Hatfield would be able to remember the subtle nuances of conversations and events occurring 18 months before, with no notes to rely upon and no mechanism to reflect his recollection.

18. Further, Mr. Hatfield's testimony is at stark variance in a number of critical particulars with the key witnesses in the case. Mr. Hatfield's representation that the bridge tender verbally instructed the Miss Sandy to "proceed through" or "come on through" not only is refuted by every single other human being on the bridge tower but also is refuted by the two individuals on the Miss Sandy. Based upon the fact that once the radio receiver was picked up, it operated as a telephone, consequently it would have been physically impossible for Mr. Hatfield to have heard the responses from the Miss Sandy that he testified he heard to the alleged admonition by the bridge tender to proceed on through. Mr. Hatfield's testimony with respect to travelling past safety mechanisms and boundaries to reach the bridge tower is not supported by and is contradicted by other credible testimony in the case and is therefore incredible.

19. Even assuming Mr. Hatfield were correct in his testimony that the Miss Sandy was dead in the water and 700 feet away from the bridge, the Miss Sandy would have had a completely ample opportunity to reposition itself in the presence of the known wind and current conditions from its position significantly southerly from the center line of the channel; the Miss Sandy could have either backed up and made another attempt to come toward the bridge or could have headed more centrally into the middle of the channel. The failure of the Miss Sandy to do so is inexplicable and unjustified in the circumstances and therefore constitutes a basis for Defendants' liability.

20. Mr. Hatfield's testimony confirmed that the bridge tenders' actions with regard to their duties to permit the passage of the Miss Sandy through the bridge were reasonable, responsible, and workmanlike.

21. Mr. Seth Castillo testified unequivocally on behalf of Defendants that he was working with Mr. Louis Herrin, Jr., one of Plaintiff's bridge tenders, on an unrelated assignment on the bridge itself, during the course of which Mr. Herrin indicated to him that he would have to stop those duties and return to the bridge tower for the specific reason that he had observed an approaching vessel and needed to attend to his duties in that regard. Thus Mr. Castillo unequivocally confirms that Mr. Herrin was workmanlike and responsible in his duties, was aware of the approaching vessel, and had an intention to undertake his responsibilities in a proper manner.

22. It is absolutely incredible to suggest that if Mr. Herrin terminated his activities with Mr. Castillo and returned to the bridge tower for the sole purpose of dealing with the approach of the Miss Sandy, that Mr. Herrin would have somehow become ignorant of those duties or unresponsive to them.

23. The opinions of Captain Kleinpeter, brought as the expert witness for the Defendants in the field of marine operations, basically support the general contentions of the Plaintiff in its interpretation of this case.

24. To the extent that the opinions of Captain Kleinpeter refute the basic liability allegations of the Plaintiff, the conclusions and findings of Captain Kleinpeter are unsupported by the totality of the record in the case and are consequently incredible.

25. The Plaintiff carried its burden of proving the Miss Sandy solely and 100% at fault for the allision in this case by a preponderance of the credible evidence, even in the absence of the application of the presumption of law against a moving vessel striking a stationary object and the application of the Rule of *The Pennsylvania* against a moving vessel that violates statutory rules.

26. The Defendants have utterly failed to carry their burden of proof in rebutting the presumptions against them as a moving vessel striking a stationary object and under the Rule of *The Pennsylvania.*

27. The Defendants have utterly failed to rebut successfully Plaintiff's proof offering of the Defendants' sole and 100% fault for the allision in this case, even in the absence of the application of the presumption of law against a moving vessel striking a stationary object and the application of the Rule of *The Pennsylvania* against a moving vessel that violates statutory rules.

28. The Miss Sandy is specifically liable in the following particulars:

(a) It failed to undertake adequate communications with the bridge on its approach;

(b) It failed to maintain proper speed in its approach to the bridge;

(c) It failed to maintain proper steerage in its approach to the bridge;

(d) It failed to back away or to take adequate evasive measures or adequate repositioning measures once it apprehended a problem with the bridge, even assuming for the moment that a problem occurred;

(e) It failed to adequately anticipate current and wind conditions in its approach to Plaintiff's bridge;

(f) It failed to properly align the tug and its tows in its approach to the bridge from its position significantly southerly from the center line of the channel; and

(g) It failed to maintain proper control of its tows in its approach to the bridge.

Defendants violated their legal duty to navigate the Miss Sandy in a reasonably prudent manner so as to avoid an allision with the traffic fender system on March 11, 1993 and prevent damage to Plaintiff's bridge; by the particular acts and omissions of Defendants found by the Court herein. All of Defendants' improper acts and omissions found by the Court were causes in fact of and contributing causes of the damages relating to Plaintiff's traffic fender system. All of Defendants' acts and omissions found by the Court herein were reasonably foreseeable by a vessel, owner, and operator of ordinary prudence that should have anticipated the danger to Plaintiff's bridge from such acts and omissions.

29. Hopson provided a tug that either had barely adequate power or lacked sufficient power to control its tows. Captain Ebert indicated a general lack of sufficient power to deal with the alleged problem, stating that he would have great difficulty stopping the vessel under way and that he could back it up from a dead stop position but would have tremendous difficulty doing that in a reasonable time and distance while the vessel was moving forward. Captain Kleinpeter frankly refutes such statements by Captain Ebert and indicates that in his opinion the power of the Miss Sandy was completely sufficient. In the event the power of the Miss Sandy were sufficient, Defendants are negligent in not exercising that sufficient and adequate power to move the vessel backwards and/or reposition the Miss Sandy for its approach to the bridge. In the event the power of the Miss Sandy were insufficient, Defendants clearly placed themselves in an *extremis* position by the lack of that power, which lack of sufficient power thus caused or contributed to cause this casualty.

30. Hopson failed to give the captain of the Miss Sandy adequate notice of potential problems with the approach to Plaintiff's bridge, which failure is remarkable, specifically given the fact that Joseph Benjamin Hopson, the President and sole shareholder of Hopson, testified he knew that an allision had occurred involving one of Miss Sandy's

sister tugs and Plaintiff's bridge less than six months previously. Thus Hopson had actual knowledge that such allision had occurred less than six months earlier. It is simply astonishing that Hopson would not inform Captain Ebert that there had been a casualty with this particular bridge within a relatively recent time frame and that Captain Ebert should be particularly aware of a potentially dangerous current and of a prevailing wind of 25 miles per hour, which is not at all uncommon in March of any year in this district and division. Such failure to give adequate warning of potential problems with the approach to Plaintiff's bridge is even more remarkable and astonishing because neither Captain Ebert nor Captain Borres had ever been through Plaintiff's bridge before March 11, 1993.

31. The Miss Sandy improperly took way off the flotilla; consequently, the prevailing current and wind, which were both known or should have been known to Captain Ebert, predictably acted upon the flotilla, causing it to set to the south of the channel's center line.

32. Once the flotilla began to set to the south of the channel's center line, the Miss Sandy failed to adequately undertake evasive actions to maneuver away from Plaintiff's bridge or to reposition herself for a safe and reasonable approach toward Plaintiff's bridge.

33. Captain Ebert and Captain Borres were acting at all material times within the course and scope of their employment with Hopson.

34. The foregoing acts and omissions by the Defendants in these findings of fact constituted violations of not only the common law rules of navigation but also the statutory duties found in the Inland Rules of Navigation, 34 U.S.C. § 2001, *et seq.* including, but not limited to, Section 2006 requiring each vessel to proceed at a safe speed so that she can take proper and effective action to avoid collision and Section 2008 requiring each vessel to take positive action in ample time to avoid collision. Such statutory violations constituted negligence, caused and contributed to the cause of the damages to Plaintiff's bridge, and impose liability on Defendants.

35. Defendants failed to prove that the allision in this case was the result of an inevitable accident. In fact, Defendants could have avoided this allision by taking reasonable actions which were available.

36. Defendants agreed and stipulated that the principal amount of the damages for which they are responsible with respect to the casualty to Plaintiff's traffic fender system on March 11, 1993, is $56,152.20, and the Court so finds. Although Plaintiff's attorneys demanded payment by Defendants of such sum of $56,152.20, Defendants have failed to make any payment with respect to such damages.

37. Since no unusual circumstances exist in the present case, Plaintiff is entitled to pre-judgment interest on the principal sum of the damages relating to Plaintiff's traffic fender system at the rate of 4% per annum, from and after March 11, 1993, the date of the casualty.

38. Plaintiff is entitled to post-judgment interest at the rate of 5% per annum.

39. Plaintiff is entitled to recover its reasonable attorney's fees as additional compensatory damages in this case, since the defense offered by the Defendants in regard to the claim of this case borders on the frivolous, is unsupported factually from a common sense standpoint, is contradictory factually even as regards its own merits, and is utterly incredible to the Court in any respect. The standards in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) have been considered in finding the amounts of reasonable and necessary attorney's fees herein.

40. The sum of $20,000.00 is a reasonable and necessary attorney's fee for legal services rendered by Plaintiff's attorneys through the trial court.

41. Reasonable and necessary attorney's fees for legal services to be rendered by Plaintiff's attorneys in the event of an appeal to the 5th Circuit Court of Appeals will be considered in due course, in the event of appeal.

42. Reasonable and necessary attorneys' fees for legal services to be rendered by

Plaintiff's attorneys in the event an application for writ of certiorari is made to the U.S. Supreme Court will be considered in due course, in the event of such.

43. Plaintiff is entitled to an award of taxable costs of Court in the amount of $211.60 for filing fees and witness fees.

44. Defendants Hopson *in personam,* Hopson Marine *in personam,* and Miss Sandy *in rem,* jointly and severally, are solely and 100% liable for the aforesaid damages, interest, attorney's fees and taxable costs of Court.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this subject matter, based upon its admiralty and maritime jurisdiction conferred in Article 3, Section 2 of the United States Constitution, 28 U.S.C. § 1333, 46 U.S.C. § 740, and Rule 9(h) of the Federal Rules of Civil Procedure, and has jurisdiction over all Defendants by their appearance herein.

2. Since the Miss Sandy was a moving vessel pushing a tow that struck the traffic fender system, a stationary object, of Plaintiff's bridge, the presumption of fault against a moving vessel that strikes a stationary object applies in this case. *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 794 (5th Cir.1977), *cert. denied* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978). This presumption shifts the burden of proof, both the burden of producing evidence and burden of persuasion, on the moving ship. *American Petrofina Pipeline Co. v. M/V Shoko Maru,* 837 F.2d 1324, 1326 (5th Cir.1988).

3. The fact that a moving vessel strikes a fixed object establishes a *prima facie* case of fault against the moving vessel, and an inference of negligence arises. *Petition of M/V Elaine Jones,* 480 F.2d 11, 17 (5th Cir.1973). After the *prima facie* case is presented by the stationary object, the burden of proof then shifts to the moving vessel to rebut the presumption of fault by showing (a) that the moving vessel was without fault, (b) the allision was occasioned by the fault of the stationary object, or (c) the allision was the result of inevitable accident. *Bunge*

*Corp. v. M/V Furness Bridge, supra* 558 F.2d at 795.

4. There is a heavy burden on the vessel asserting inevitable accident to prove that such vessel exhausted every reasonable possibility which the circumstances admit and show that in each respect they did all that reasonable care required. *Id.* at 795; *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.,* 377 F.2d 724, 726 (5th Cir.1967). Defendants did not carry their burden of proof that the Miss Sandy exhausted every reasonable possibility and that she did all that reasonable care required in this case.

5. To rebut the presumption of fault, the moving vessel must show that it was not in her power to prevent the damages by adopting any practical precautions. *Creole Shipping LTD. v. Diamandis Pateras, LTD.,* 410 F.Supp. 313, 318 (S.D.Ala.1976) *aff'd.* 554 F.2d 1348 (5th Cir.1977); *West India Fruit & Steamship Co. v. Raymond,* 190 F.2d 673, 674–675 (5th Cir.1951). The Defendants failed to rebut the presumption of fault and failed to show that it was not in the power of the Miss Sandy to prevent the damages by adopting any practical precautions.

6. Since the Miss Sandy was a moving vessel striking a fixed object, a *prima facie* case of fault against the Defendants was established, an inference of negligence arose, and the burden of proof shifted to the Defendants. However, Defendants failed to carry their burden of proof, because they failed to show that the Miss Sandy was without fault, the allision was caused by the fault of the Plaintiff's traffic fender system, or the allision was the result of inevitable accident.

7. A vessel may violate statutory duties as a basis for negligence. Under the Rule of *The Pennsylvania,* the burden rests upon the party guilty of a statutory fault to show, not only that probably his fault did not contribute to the disaster, but that it could not have done so. *The Pennsylvania v. Troop,* 86 U.S. 125, 134–35, 22 L.Ed. 148, 151 (1874). The 5th Circuit concluded in *Atlantic Mutual Ins. Co. v. ABC Ins. Co.,* 645 F.2d 528, 531 (5th Cir.1981) that the Rule of *The Pennsylvania* continues to apply after the

**370**

U.S. Supreme Court's decision in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). In the present case, since Defendants violated statutory duties of navigation, the Rule of *The Pennsylvania* does apply to Defendants, the burden of proof shifted to Defendants to show that their statutory fault could not have contributed to the allision, and Defendants have failed to meet the burden placed upon them under the Rule of *The Pennsylvania.*

8. In order to negate negligence, the tug must show it was free from fault by demonstrating whether it took reasonable precautions under the circumstances as known or reasonably to be anticipated. *Petition of United States*, 425 F.2d 991, 995 (5th Cir.1970). Defendants not only failed to take reasonable precautions but also disobeyed statutory rules of navigation that were intended to prevent collisions.

9. Defendants have a common law duty to navigate the Miss Sandy with due care and in a reasonably prudent manner so as to avoid an allision and prevent damage to Plaintiff's bridge. Defendants also have a statutory duty to navigate the Miss Sandy in a manner consistent with the Inland Rules of Navigation, 34 U.S.C. § 2001, *et seq.*, which requirements exist to avoid an allision. Even if there were no presumption of law against a moving vessel that strikes an immovable object and no application of the Rule of *The Pennsylvania* due to the statutory violations of Defendants, the Court concludes that the Defendants in this case were negligent, were solely at fault, and violated applicable statutory duties of navigation. Such negligence, fault, and statutory violations were the sole and 100% proximate cause of and contributed to the cause of the allision in this case. Under circumstances such as those in the instant case, the vessel and its owner and operator are liable for the damages caused by the vessel's tow to the traffic fender system of Plaintiff's bridge. The Court concludes that Miss Sandy is liable for the resulting damages from said allision *in rem*, and Hopson and Hopson Marine are liable for the resulting damages from said allision *in personam* as the owner and operator of the Miss Sandy.

10. Plaintiff complied with all applicable statutes and regulations, was not negligent, and did not proximately cause the allision of March 11, 1993 in any way. Immediately upon receipt of a proper signal, Plaintiff began the process for opening. As a consequence of that action, there was no unreasonable delay in raising the bridge in this case. Thus the Rule of *The Pennsylvania* does not apply against Plaintiff in this case.

11. In the case of *State of Connecticut v. Tug Cynthia Moran*, 607 F.Supp. 24 (D.Conn.1984), the tug made a proper request to a railroad drawbridge to open and was told that it would be opened; however, the bridge operator failed to get permission from a supervisor 100 miles away and, in fact, never opened the bridge. *Id.* at 29. The tug consequently struck the fenders of another bridge in an attempt to slow down. *Id.* at 29. The Court hearing that case held that the tug operated prudently and that the railroad bridge operator was negligent. *Id.* at 29. This Court concludes that the facts in the *Tug Cynthia Moran* case are utterly inapposite to the facts in this case and that it is therefore distinguishable on its facts.

12. In *Florida East Coast Railway Co. v. Revilo Corp.*, 637 F.2d 1060 (5th Cir.1981), a tug gave the proper whistle signal to the bridge, but the drawbridge failed to open. *Id.* at 1063. After three tries, the tug struck stationary materials and leaked oil in the river. *Id.* at 1063. The Court found that the bridge was 80% negligent for failing to open when a proper signal was given by the tug. *Id.* at 1064. In addition, the bridge did not have radio equipment that allowed direct communication with the tug, and the Court found this to be a contributing cause in fact. *Id.* at 1064. This Court concludes that the facts in the *Florida East Coast Railway Co.* case are inapposite to the facts in this case and that it is thus distinguishable on its facts.

13. In *Trinadad Corp. v. Massachusetts*, 1984 A.M.C. 260, the Court considered a movable drawbridge and found that it was not a stationary object. However, no facts are cited in that opinion. The Court merely stated that the drawbridge, easily movable and obliged to fully withdraw from

the navigable water, is not to be considered a stationary object. The Fifth Circuit does not follow such a rule. Many Fifth Circuit cases assume that a tug hitting a drawbridge has hit a stationary object. The only case this Court has found to the contrary is an unappealed one out the Eastern District of Louisiana. *United States v. Sabine Towing and Transportation, Inc.,* 289 F.Supp. 250 (E.D.La.1968). In that case, the District Court asserted that where a drawbridge is not maintained in an open position at the time of the collision with a fender, the bridge is not stationary under the presumptive rule. *Id.* at 252. This holding has never been cited by another Court, is not binding on this Court, and this Court respectfully declines to follow it.

14. The notion to exempt a drawbridge from the presumption of law against a moving vessel striking a stationary object and the application of the Rule of *The Pennsylvania* against a moving vessel is ludicrous on its face. While some portion of the bridge may be raised and lowered, the traffic fender system and the part of the bridge involved in this particular casualty are fixed and remain fixed throughout any such allision; consequently, as a matter of both common sense and reason, this allision involving an immovable object falls within the ambit of the presumption of law against a moving vessel striking an immovable object and the application of the Rule of *The Pennsylvania* against a moving vessel. To the extent that such a holding has not been made in the Fifth Circuit previously, this Court so holds today.

15. Since the Court has found that the defense offered by the Defendants in regard to the claim of this case borders on the frivolous, is unsupported factually from a common sense standpoint, is contradictory factually even as regards its own merits, and is utterly incredible to the Court in any respect, the Court concludes that awarding reasonable attorney's fees to Plaintiff's attorneys in the present case is proper, equitable, and just. It is necessary to award Plaintiff its attorney's fees in order to make Plaintiff whole.

16. The Court concludes that as a trial court sitting admiralty it has the power to impose attorney's fees. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). The present case contains appropriate circumstances for an admiralty plaintiff to be awarded attorney's fees as an item of compensatory damages. *Fleischmann Distilling Corp. v. Maier Brewing Co., supra,* 386 U.S. at 718, 87 S.Ct. at 1407. Plaintiff's attorney's fees constitute a necessary expense in the instant case. *Vaughan v. Atkinson, supra,* 369 U.S. at 530, 82 S.Ct. at 999. By failing to pay for the damages it obviously caused in an amount that Defendants stipulated and agreed was reasonable, the Defendants have not acted in an equitable manner in the equity action before this Court and have required Plaintiff to incur significant attorney's fees in order to recover the damages relating to its traffic fender system that were plainly owed to Plaintiff. *Id.* at 530, 531, 82 S.Ct. at 999, 999. Defendants' default herein was willful and persistent. *Id.* at 531, 82 S.Ct. at 999.

17. Defendants Hopson *in personam,* Hopson Marine *in personam,* and Miss Sandy *in rem,* jointly and severally, are solely and 100% liable for the stipulated damages relating to Plaintiff's traffic fender system in the principal amount of $56,152.20, plus pre-judgment interest thereon at the rate of 4% per annum, reasonable and necessary attorney's fees as further compensatory damages in the sum of $20,000.00, through the trial court, post-judgment interest at the rate of 5% per annum, and taxable costs of Court in the sum of $211.60 for filing fees and witness fees.

### FINAL JUDGMENT

This cause came on regularly for trial before the Court sitting without a jury, on February 9, 1995, with Michael L. Wilson appearing as attorney for the Plaintiff and Robert S. De Lange appearing as attorney for the Defendants, and the Court having considered the pleadings, having heard the testimony and having examined the proofs offered by the respective parties, having filed herein its findings of fact and conclusions of

law, and having directed that judgment be entered in accordance therewith,

Now, therefore, by reason of the law and findings,

IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff Galveston County Navigation District No. 1 have judgment against Defendant Hopson Transportation, Inc. *in personam*, Defendant Hopson Marine Transportation, Inc., *in personam*, and Defendant M/V Miss Sandy, its engines, tackle, equipment, machinery, gear, furniture, apparel, appurtenances, etc., *in rem*, jointly and severally, in the sum of $80,570.53, which consists of damages relating to Plaintiff's traffic fender system in the principal amount of $56,152.20, pre-judgment interest thereon in the amount of $4,418.33, and reasonable and necessary attorney's fees through the trial court as further compensatory damages in the amount of $20,000.00; with interest thereon at the rate of five per cent (5%) per annum from the date of the signing of this judgment until paid; and costs of Court in the amount of $211.60 for filing fees and witness fees.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Galveston County Navigation District No. 1 take nothing against Defendant Hopson Towing Co., Inc. *in personam*.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Galveston County Navigation District No. 1 is allowed such writs and processes as may be necessary in the enforcement and collection of this judgment.

All other relief not expressly granted in this judgment is denied.